UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 06-466-GWU

TERESA GABBARD,                                                    PLAINTIFF,

VS.                          **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                          DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Disability Insurance Benefits (DIB).  The appeal is currently before the Court on cross-motions for summary judgment.

### APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1.     Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled.  If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2.     Does the claimant have any medically determinable physical or mental impairment(s)?  If yes, proceed to Step 3.  If no, the claimant is not disabled.  See 20 C.F.R. 404.1508, 416.908.

3.     Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities?  If yes, proceed to Step 4.  If no, the claimant is not disabled.  See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

06-466 Gabbard

4.     Can the claimant's severe impairment(s) be expected to result
       in death or last for a continuous period of at least 12 months?
       If yes, proceed to Step 5.  If no, the claimant is not disabled.
       See 20 C.F.R. 404.920(d), 416.920(d).

5.     Does the claimant have any impairment or combination of
       impairments meeting or equaling in severity an impairment
       listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of
       Impairments)?  If yes, the claimant is disabled.  If no, proceed
       to Step 6.   See 20 C.F.R. 404.1520(d), 404.1526(a),
       416.920(d), 416.926(a).

6.     Can the claimant, despite his impairment(s), considering his
       residual functional capacity and the physical and mental
       demands of the work he has done in the past, still perform this
       kind of past relevant work?   If yes, the claimant was not
       disabled.  If no, proceed to Step 7.   See 20 C.F.R.
       404.1520(e), 416.920(e).

7.     Can the claimant, despite his impairment(s), considering his
       residual functional capacity, age, education, and past work
       experience, do other work--i.e., any other substantial gainful
       activity which exists in the national economy?  If yes, the
       claimant is not disabled.   See 20 C.F.R. 404.1505(a),
       404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent
to the judicial review of administrative agency action apply.  Review of the
Commissioner's decision is limited in scope to determining whether the findings of
fact made are supported by substantial evidence.  Jones v. Secretary of Health and
Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991).  This "substantial
evidence" is "such evidence as a reasonable mind shall accept as adequate to

2

support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. <u>Garner</u>, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. <u>Bowie v. Secretary</u>, 679 F.2d 654, 656 (6th Cir. 1982). This presumes, of course, that the treating physician's opinion is based on objective medical findings. <u>Cf. Houston v. Secretary of Health and Human Services</u>, 736 F.2d 365, 367 (6th Cir. 1984); <u>King v. Heckler</u>, 742 F.2d 968, 973 (6th Cir. 1984). Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary. <u>Hardaway v. Secretary</u>, 823 F.2d 922 (6th Cir. 1987). These have long been well-settled principles within the Circuit. <u>Jones</u>, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain. Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms. 20 C.F.R. Section 404.1529 (1991). However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition. If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the alleged

06-466 Gabbard

pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

06-466 Gabbard

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category

5

06-466 Gabbard

if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid.  In such cases, the agency may be required to consult a vocational specialist.  Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately

6

portrays the plaintiff's physical and mental impairments.  Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Teresa Gabbard, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of coronary artery disease status post coronary artery bypass grafting and stent placement, obesity, and non-insulin dependent diabetes mellitus with early diabetic retinopathy. (Tr. 21).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that the plaintiff retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 23-5).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age, education, and work experience could perform any jobs if she were limited to "medium" level exertion, and also had the following non-exertional restrictions. (Tr. 336).  She: (1) could not be exposed to concentrated temperature extremes; (2) could perform no work requiring acute vision; and (3) could only occasionally work with her hands overhead. (Id.).  The VE responded that there were jobs that such a person could perform, and proceeded to provide examples at the medium and light level and give the numbers in which they existed in the state and national economies. (Tr. 337-8).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence.

The plaintiff testified that she stopped working in 2002 after having heart surgery, although she had remained on the payroll for another year. (Tr. 321-3). In July, 2002 a stent was placed, but she had not received any cardiac followup because her main cardiologist had left town, and she was seeing a family physician. (Tr. 323-4, 326-7). Other problems included high blood sugar, for which she was on oral medication; previously, she had not been following her doctor's orders, but her blood sugar still remained high despite following instructions. (Tr. 325). She described poor vision, partly due to cataracts, and partly due to diabetes. (Tr. 329). Her other main problem was depression and anxiety, which had caused her to not care about herself for some period and not follow her doctor's orders. (Tr. 324, 327). She had seen a counselor, Julia States, in 2003, but had not seen anyone since, and did not know why, although she was taking the medication Lexapro. (Tr. 327-9). She stated that she was doing better about getting out of her house and had decided she had to live her life, and had been going out to restaurants with friends and to church. (Tr. 328).

Medical records in the transcript include reports from various cardiologists reflecting a two vessel coronary artery bypass in January, 2002. (Tr. 121-2). On followup, Mrs. Gabbard was said to be doing extremely well (Tr. 147), but in July of 2002 a repeat catheterization showed 80 percent stenosis in an artery. (Tr. 166-9).

After a stent was placed, the stenosis was reduced to zero percent.  (Tr. 170).  Even before the placement of the stent, an exercise stress test had placed her functional capacity at "Class I" by treadmill, which would represent no impairment under New York Heart Association guidelines.   (Tr. 173).   American Medical Association, Guides to the Evaluation of Permanent Impairment, (Fifth Ed. 2001), p. 26.  At the last reported visit to the plaintiff's cardiologist, her heart disease was said to be stable and her hypertension was well controlled.  (Tr. 171).

The plaintiff was treated for diabetes with oral agents, and an eye clinic note in January, 2003, indicates moderate non-proliferative diabetic retinopathy.  (Tr. 205).  Apparently corrective lenses were supplied, and Mrs. Gabbard was said to be "overall doing very well" in January, 2003.  On June 30, 2003, it was noted that her blood sugar had been "stabilized," and she could resume normal contact lens wear.  (Tr. 202).  A note from Dr. Jack Hollins on June 28, 2005 indicates that the plaintiff had reduced vision, possibly 20/200, due to cataracts and diabetes, and would benefit from cataract surgery, but would still have some decrease in vision secondary to diabetes. (Tr. 304).[1]  A consultative physician, Dr. Rita Ratliff, measured Mrs. Gabbard's vision as 20/50 with contacts in September, 2003 (Tr. 210), although the plaintiff appeared to indicate that it had recently become worse

---

[1]The plaintiff testified at the May 25, 2005 administrative hearing that she had laser eye surgery in November, 2004, but it is not clear from the medical records who performed the surgery or the result.  (Tr. 330).

(Tr. 333).  No physician appears to have placed any functional restrictions on the plaintiff due to this specific problem.

The plaintiff was seen by Vera Hopper, a certified family nurse practitioner, at the Hazard Clinic on several occasions beginning in September, 2003 for depression and anxiety, although she initially denied physical problems.  (Tr. 245).  The depression was said to be due to "major family problems," and she was referred to a counselor, Ms. States.  (Id.).  After consulting with a clinic physician, Dr. Wicker, Hopper prescribed several medications, including Klonopin and Lexapro.  (Id.).  Mrs. Gabbard reported she was doing much better on followup visits in September, October, and November, 2003.  (Tr. 240-4).  Hopper also treated the plaintiff for diabetes mellitus which was out of control in January, 2004, but the plaintiff stated that she was not taking her medication.  (Tr. 295).  She also admitted that she went off her diet frequently.  (Tr. 292).  In March, 2005, Hopper complained that the plaintiff rarely came to the clinic, ate what she wanted, did not take care of herself, and did not really seem to care.  (Tr. 288).

A letter from Julia L. States, a licensed clinical social worker, is dated October 21, 2003, and reports treatment for severe depression and anxiety due to multiple family and financial stressors.  (Tr. 246).  Some office notes show that one of the stressors was the decision of Mrs. Gabbard's husband to leave her.  (Tr. 248).  Ms. States stated that the plaintiff was in no condition emotionally or physically to work, and had difficulty managing daily activities.  (Tr. 247).

10

The plaintiff was examined by a psychiatrist, Dr. Robert Jack Eardley, on February 21, 2004, and he reviewed the notes from Julia States. (Tr. 257). The plaintiff described poor sleep, and worry and stated that the only time she would go out of her house was to visit friends and family, but admitted she had gone to Wal-Mart the previous week. (Tr. 258). Dr. Eardley felt that her mood and affect suggested clinical depression, but added that it might be due to menopausal issues, physical problems such as coronary artery disease, as well as job loss, divorce, and physical impairments. (Tr. 260). Dr. Eardley did not provide any specific functional capacity assessment although he reported that she was able to understand and carry out instructions during the interview. (Id.).

A state agency psychologist, Dr. Edward Stodola, reviewed the evidence as of March 5, 2004, and concluded that Mrs. Gabbard did not even have a "severe" mental impairment. (Tr. 262, 274). He included a report of contact with Julia States, which included the information that States had not seen the plaintiff since November, 2003, due to financial issues. (Tr. 276). She added that the plaintiff's psychological stress and limitations were due primarily to her medical conditions and situational factors, "should these resolve, her psychological difficulties would likely resolve as well."

A letter signed by Vera Hopper and Dr. Mitchell Wicker, dated June 23, 2005, stated that the plaintiff had several problems including depression, diabetes, and irritable bowel syndrome. (Tr. 302-3). The letter describes complications from

11

diabetes detected on an April, 2005 office visit, shortly after Hopper criticized the plaintiff for not being compliant with her diet and not taking care of herself.  (Tr. 302).  She had occasional numbness and tingling in her hands and feet and "painful nodules" in her hands from diabetes, had glaucoma and limited driving vision and panic attacks which triggered irritable bowel syndrome.  (Tr. 303).  She reportedly spent most of her time at home, although there were days when she was able to cope with public outings.  (Id.).  The letter concludes that "I believe that due to her complicated mental problems, she is not able to perform even routine job duties in the work force."  (Id.).

The ALJ rejected this opinion because it contained a conclusory opinion of disability, and because it lacked objective evidence.  (Tr. 21).  He also noted that the plaintiff's testimony was that her depression and anxiety had improved.  (Id.).  While the opinion of a treating physician is normally entitled to controlling weight, this is not the case where the opinion is contradicted by the plaintiff's own statements.  Warner v. Commissioner of Social Security, 375 F.3d 387, 391 (6th Cir. 2004).  Moreover, even assuming that Dr. Wicker was a treating source, he provided a vocational conclusion outside a physician's area of expertise.  Finally, the problems related to diabetes described in the letter apparently took place at approximately the same time the plaintiff was admitting that she did not follow her diet.  For all of these reasons, the ALJ could reasonably have rejected the disability opinion.  The ALJ could reasonably have relied on the opinion of Dr. John Rawlings,

06-466 Gabbard

a state agency reviewer, whose findings were not inconsistent with the hypothetical question.  (Tr. 214-22).

The plaintiff argues that the ALJ committed error in failing to consider her depression and anxiety as "severe" impairments.  For the reasons given previously, there was evidence from the plaintiff's testimony and from the reports of the non-examining reviewers that supported the ALJ's determination.

Finally, the plaintiff argues that the ALJ did not analyze and investigate the issue of whether she met the Commissioner's Listings of Impairment 4.04, Ischemic Heart Disease, and 9.08, Diabetes Mellitus.[2]  However, it is not the ALJ's burden to

---

[2]Listing 4.04 provides for a finding of disability if a claimant can show:

*Ischemic heart disease*, with chest discomfort associated with myocardial ischemia, as described in 4.00E3, while on a regimen of prescribed treatment (see 4.00A if there is no regimen of prescribed treatment).  With one of the following:

A.  Sign- or symptom-limited exercise test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:

1.  Horizontal or downsloping depression, in the absence of digitalis glycoside therapy and/or hypokalemia, of the ST segment of at least -0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead (other than aVR) and that have a typical ischemic time course of development and resolution (progression of horizontal or downsloping ST depression with exercise, and persistence of depression of at least -0.10 millivolts for at least 1 minute of recovery); or

2.  An upsloping ST junction depression, in the absence of digitalis glycoside therapy and/or hypokalemia, in any lead (except aVR) of at least -0.2 millivolts or more for at least 0.08 seconds after the J junction and persisting for at least 1 minute of recovery; or

3.  At least 0.1 millivolt (1 mm) ST elevation above resting baseline during both exercise and 3 or more minutes of recovery in ECG leads

06-466 Gabbard

with low R and T waves in the leads demonstrating the ST segment displacement; or

4.  Failure to increase systolic pressure by 10 mmHg, or decrease in systolic pressure below usual clinical resting level (see 4.00C2b); or

5.  Documented reversible radionuclide "perfusion" (thallium[201]) defect at an exercise level equivalent rto 5 METs or less;

OR

B.  Impaired myocardial function, documented by evidence (as outlined under 4.00C3 or 4.00C4b) of hypokinetic, akinetic, or dyskinetic myocardial free wall or septal wall motion with left ventricular ejection fraction of 30 percent or less, and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, and resulting in marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest;

OR

C.  Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation), and an evaluating program physician, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise testing would present a significant risk to the individual, with both 1 and 2:

1.  Angiographic evidence revealing:

a.  50 percent or more narrowing of a nonbypassed left main coronary artery; or

b. 70 percent or more narrowing of another nonbypassed coronary artery; or

c.  50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d.  50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or

e.  Total obstruction of a bypass graft vessel; and

2. Resulting in marked limitation of physical activity, as demonstrated

14

06-466 Gabbard

prove that a claimant does not meet a Listing; it is the plaintiff's burden to prove that

she does meet a Listing.  See, e.g., Sullivan v. Zebley, 493 U.S. 521, 530-2 (1990);

Foster v. Halter, 279 F.3d 348, 353-6 (6th Cir. 2001).  The plaintiff does not point to

any medical evidence that the Listings were met or equaled other than a possible

visual impairment of 20/200, but this note does not identify whether the results were

corrected or uncorrected.  (Tr. 304).  Listing 2.02, cited in LOI 9.08, requires that the

vision be 20/200 or less after best correction.

The decision will be affirmed.

This the 20th day of July, 2007.



**Signed By:**

**G. Wix Unthank**

**United States Senior Judge**

---

by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though the individual is comfortable at rest.

Listing 9.08 provides for a finding of disability if a claimant can show:

*Diabetes mellitus.*  With:
A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or
  B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $PCO_2$ or bicarbonate levels); or
  C. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.